`IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| B.S.T. AG SOLUTIONS, INC., | : |
| Plaintiff, | : |
| v. | : CASE NO.: 1:15-CV-88 (LJA) |
| PWB AG CONSULTING, LLC, PIETER BOOYSEN, | : |
| Defendants. | : |

## FINAL ORDER

Before the Court is Plaintiff B.S.T. Ag Solutions, Inc.'s Motion for a Preliminary Injunction (Doc. 2), in which Plaintiff seeks to enjoin Defendants PWB AG Consulting, LLC and Pieter Booysen from, among other things, selling and distributing a Russian-produced fertilizer known as Albit. The Court previously granted Plaintiff's Motion for a Temporary Restraining Order on June 8, 2015, (Doc. 5); and, on June 18, 2015, the Court held a hearing on Plaintiff's Motion for a Preliminary Injunction. Based on the testimony and evidence presented therein, the Court issued a preliminary Order denying Plaintiff's Motion for a Preliminary Injunction and dissolving the Temporary Restraining Order. (Doc. 17.) As set forth more fully below, the Court finds that Plaintiff has failed to meet its burden as to each of the four prerequisites for issuing the extraordinary and drastic remedy of a preliminary injunction enjoining Defendants from selling and distributing Albit.

## FINDINGS OF FACT[1]

This action arises out of a commercial dispute regarding the distribution rights to Albit. Albit is "an innovative biological product effectively protecting plants against drought,

---

[1] The Court makes the following findings for the limited purpose of deciding Plaintiff's Motion for a Preliminary Injunction and based on the evidence submitted during the hearing held on the Motion. *See United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (noting that "the trial judge's conclusions of law as well as his findings of fact at the preliminary injunction stage are not binding on him in his determination of the merits").

diseases, and other stresses." (Doc. 8-1 at ¶ 23.) It is sold in 1-liter bottles, with a label reading "Albit – Liquid paste to improve Plant Growth and Stress Tolerance." (Def. Ex. 7.)

In December 2012, Defendant Booysen located Albit through an internet search and subsequently contacted the manufacturer to arrange to receive a few liters of the fertilizer for testing. Upon receiving the Albit, Defendant Booysen began performing tests and documenting his results to send to the manufacturer. (*See* Def. Ex. 20.) He remained in communication with the manufacturer and, in April 2013, became the official distributor for the United States and Canada. (*Id.*; *see also* Def. Ex. 14.) This understanding was memorialized in writing in August 2013, and was renewable on an annual basis. (*See* Pl. Ex. 28.)

Sometime in 2012, Defendant Booysen met Robert Thompson. Thompson subsequently introduced Defendant Booysen to his business partner, Ronny Shingler. Shingler and Thompson own Georgia Organic Solutions, LLC ("GOS"). GOS imports and distributes natural and organic fertilizers for the agricultural industry. Its main product is a fertilizer known as "GOS Neem 7-way," which is primarily comprised of Neem oil. (Def. Ex. 2.) For several years prior to 2012, Thompson and Shingler had attempted, unsuccessfully, to apply Neem oil to a granule to prevent it from solidifying when temperatures fell below sixty degrees. Although Defendant Booysen was unfamiliar with Neem oil, he had prior experience with granules. Defendant Booysen believed he could develop a viable technique to apply Neem oil to a granule, and began discussing the possibility of forming a company with Shingler and Thompson to develop such an application.

On July 18, 2013, Shingler, Thompson, and Defendant Booysen formed Plaintiff B.S.T. Ag Solutions, Inc. ("B.S.T." or "Plaintiff") for the purpose of developing, patenting and distributing the granule application of the Neem oil.[2] Each of the members was granted equal shares in the corporation and elected to the board of directors. (Pl. Ex. 1.) Additionally, Shingler was elected as president, Defendant Booysen was elected as vice president, and Thompson was elected as secretary/treasurer. (*Id.*) Shingler and Thompson

---

[2] Eventually, Defendant Booysen successfully developed a viable granule application of the Neem oil, which became known as "TAS-007."

loaned B.S.T. $80,000 as start-up capital to develop and distribute TAS-007 and Defendant Booysen contributed his time, effort, and intellectual property.[3] There is no agreement memorializing the respective contributions of each party.

In January 2014, Defendant Booysen declined a job offer from R.W. Griffin – a fertilizer producer and retailer – to work on specialty agricultural products because Shingler and Thompson wanted him to continue working on the development of TAS-007. Plaintiff agreed to pay Defendant Booysen, as a consultant, $6,000 per month, 10% commission on all new Neem oil sales, and to reimburse him for his expenses for a six-month period, ending in July 2014. In return, during the six-month period, Defendant Booysen agreed to distribute Albit through B.S.T. and contribute all profits derived therefrom to the development of TAS-007. Payments made pursuant to this agreement were made to Defendant Booysen's company, Defendant PWB. (Def. Ex. 23.) This agreement was memorialized in an email dated, January 21, 2014. (Def. Ex. 3.)

There is no evidence of any shareholder agreement, employment agreement, non-compete agreement, non-solicitation agreement, confidentiality agreement, corporate by-laws, or any other document establishing that Plaintiff obtained the exclusive right to distribute Albit in the United States. Rather, the evidence demonstrates that Plaintiff acquired the right to distribute Albit only for the limited six-month period expressly agreed to by the Parties in the January 21, 2014 email.

Following the expiration of the six-month agreement, Defendant Booysen continued to distribute Albit through B.S.T. Although Plaintiff continued to reimburse Defendant PWB for some of his expenses and make payment on commissions for new Neem oil sales, it ceased paying Defendant PWB its $6,000 monthly consulting fee. (Def. Ex. 23.) Nevertheless, in December 2014, Defendant Booysen negotiated, on behalf of B.S.T., for R.W. Griffin to have the exclusive right to distribute Albit in Georgia, Alabama, and the Florida panhandle. Shingler and Thompson, however, rejected the deal because Thompson wanted to provide his son with the right to distribute Albit in Alabama and because R.W. Griffin required a certain amount of Albit as collateral. Without the exclusive right to

---

[3] A central dispute in this is case is whether Defendant Booysen offered his intellectual property regarding TAS-007 or Albit or both as his consideration for being granted a one-third ownership interest in B.S.T.

distribute Albit in Alabama and the required collateral, R.W. Griffin walked away from the deal with B.S.T.

In early to mid-January 2015, Defendant Booysen and Shingler met at the office of their accountant in an attempt to resolve their differences regarding the R.W. Griffin deal and how the relationship between the parties would be structured going forward. However, the parties were unable to reach an agreement and Defendant Booysen expressed his desire to end his relationship with B.S.T. Defendant Booysen subsequently met with Shingler at a Zaxby's parking lot on January 21, 2015, and reiterated his desire to part ways.

On January 23, 2015, Defendant Booysen informed Shingler and Thompson that in order for B.S.T to continue distributing Albit, B.S.T was required to enter into an "Authorized Distribution Agreement" with Defendant PWB. (Pl. Ex. 7.) The manufacturer of Albit provided an email to this effect on January 26, 2015. (Def. Ex. 14.) Although B.S.T. had previously ordered directly from the exporter of Albit, the manufacturer instructed Shingler to place all future orders through Defendant PWB. (*Id.*) On February 3, 2015, Plaintiff rejected Defendants' offer to enter into an Authorized Distribution Agreement. (Pl. Ex. 8.) On February 19, 2015, Defendants informed Plaintiff that the sub-distribution agreement was no longer available and that Defendant Booysen was unable to continue working with B.S.T. on a daily basis. (Pl. Ex. 9.)The Parties relationship apparently devolved from there and, on June 9, 2015, Defendant Booysen formally resigned from the board of directors and as an executive of B.S.T.

Following the rejection of the R.W. Griffin deal by Shingler and Thompson, Defendant Booysen, through Defendant PWB, granted R.W. Griffin the exclusive right to distribute Albit in Georgia, Alabama, and the Florida panhandle. Defendants only entered into this agreement once B.S.T. expressly rejected the R.W. Griffin deal.

## **DISCUSSION**

"In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotations, citations and alterations omitted). To meet this burden, the movant must show that: "(1) it

has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id.*

Plaintiff contends that it is entitled to injunctive relief under (1) general corporate law, (2) the Georgia Trade Secrets Act, and (3) the Georgia Uniform Deceptive Trade Practices Act. Plaintiff's claims fail.

## I. Likelihood of Success on the Merits

### A. General Corporate Law

Plaintiff contends that Defendants should be enjoined from importing, selling, and marketing Albit in the United States because Defendant Booysen granted Plaintiff the exclusive right to distribute Albit in the United States as consideration for his one-third ownership interest in B.S.T. In other words, according to Plaintiff, the exclusive right to distribute Albit is a corporate opportunity of B.S.T. and Defendant Booysen's claim to be Albit's exclusive distributor violates his fiduciary duties to B.S.T.

"Under Georgia law, the paradigmatic 'usurpation of a corporate opportunity' claim arises when a corporate director or officer is presented with a business opportunity that could benefit the corporation, but the director conceals the opportunity from the corporation in order to avail himself of it personally." *Fisher v. State Mut. Ins. Co.*, 290 F.3d 1256, 1264 (11th Cir. 2002). Under such circumstances, Georgia law permits the issuance of injunctive relief in order to prevent such unlawful competition. *See Southeast Consultants, Inc. v. McCrary Eng'g Corp.,* 273 S.E.2d 112, 118 (1980) (finding that trial court did not err in enjoining defendant from accepting corporate opportunity).

"A business opportunity arises from a 'beachhead' consisting of a legal or equitable interest or an 'expectancy' growing out of a pre-existing right or relationship." *United Seal & Rubber Co. v. Bunting,* 285 S.E.2d 721, 722 (1982) (citing *McCrary*, 273 S.E.2d at 118). In *McCrary*, the Georgia Supreme Court adopted a two-step approach for determining when liability for wrongful appropriation of a corporate opportunity should be imposed.

> First, a court must determine whether the appropriated opportunity was in fact a business opportunity rightfully belonging to the corporation. If a court

5

> finds that the business opportunity was not a corporate opportunity, the directors or officers who pursued the opportunity for personal benefit are immune from liability. However, if the court finds that the business opportunity was a bona fide corporate opportunity, the court must determine whether the corporate official violated a fiduciary duty in appropriating that opportunity.

273 S.E.2d at 117. "The burden of proof with regard to the threshold question of whether an opportunity presented to a corporate fiduciary is a corporate opportunity rests upon the party attacking the acquisition." *Mau, Inc. v. Human Technologies, Inc.*, 619 S.E.2d 394, 396-97 (Ga. Ct. App. 2005) (quotations and alterations omitted). To meet this burden, the movant must establish that: (1) the opportunity is one that the corporation is financially able to undertake; (2) the opportunity is in the same line of business as the corporation's business; (3) the opportunity is of practical advantage to the corporation; and (4) the opportunity is one in which the corporation has an interest or reasonable expectancy. *Brewer v. Insight Tech., Inc.*, 689 S.E.2d 330, 334 (Ga. Ct. App. 2009).

The Court finds that Plaintiff has failed to carry its burden of establishing that the exclusive right to distribute Albit in the United States is a corporate opportunity of B.S.T. The evidence and testimony presented during the hearing establish that Defendant Booysen obtained the exclusive right to distribute Albit prior to the formation of B.S.T. That Defendant Booysen agreed to distribute Albit for a limited six-month period in 2014 does not transform that right into a corporate opportunity. Rather, the profits derived from the sale of Albit were explicitly designated as a method of payment for Defendant Booysen's expenses and consultation fee, to repay a loan Defendant Booysen intended to take out to buy the first order of Albit, and to generate more sales of B.S.T.'s products and Neem oil. (Pl. Ex. 2.) Although Plaintiff contends that Defendant Booysen agreed to give up his right to sell Albit as collateral for his one-third interest in B.S.T., Plaintiff cannot point to any documentary evidence to support its claim. Rather, this is the proverbial case of he said/she said, and, under such circumstances, the Court cannot conclusively determine that Plaintiff is likely to succeed on the merits of its claim.

Moreover, if by selling Albit, a product that Defendants had a preexisting right to sell, through B.S.T. converted the right to make future sale of Albit into a corporate opportunity

of B.S.T., then arguably Defendant Booysen's sale of Neem Oil through B.S.T. would also constitute a corporate opportunity of B.S.T.; and Shingler and Thompson would have violated their duties to B.S.T. by making sales of Neem through GOS. This is not the case – as Plaintiff conceded during the hearing – because GOS had the preexisting right to sell Neem oil. The same holds true with respect to Defendants' right to sell Albit. In other words, just as GOS's right to sell Neem oil preexisted the formation of B.S.T., so too did Defendants' right to sell Albit.  Thus, absent an agreement to the contrary, the right to distribute Albit does not constitute a corporate opportunity of B.S.T.

Furthermore, Plaintiff has failed to establish that its expectancy in the perpetual right to distribute Albit in the United States was reasonable. It is axiomatic that an "assignee has no more rights under the contract than the assignor would have in dealings with the other contracting party." *Algernon Blair, Inc. v. Nat'l Sur. Corp.*, 151 S.E.2d 724, 725 (1966). More simply put, "[a] party cannot assign legal rights or interests that it does not own; rather, an assignment merely enables the assignee to step into the assignor's shoes." *Connell v. CitiMortgage, Inc.*, No. 11-CV-443, 2012 WL 5511087, at *9 (S.D. Ala. Nov. 13, 2012). Defendants' right to distribute Albit is not indefinite; rather, it must be renewed on an annual basis. (*See* Pl. Ex. 28.) Therefore, Plaintiff could not have reasonably expected to have the *perpetual* right to distribute Albit in the United States because Defendant Booysen did not have such a right to assign.[4] Instead, Defendants' distribution right "merely constitutes an ongoing relationship with no finite aspect." *Singer v. Habif, Arogeti & Wynne, P.C.*, 297 S.E.2d 473, 476 (1982). As such, a perpetual right to be the exclusive distributor of Albit in the United States does not constitute a corporate opportunity of B.S.T. *See id.*

To the extent Plaintiff contends that the R.W. Griffin deal was a corporate opportunity, such claim also fails. First, the Georgia Supreme Court has held that "the opportunity of dealing with certain customers [does] not constitute a business opportunity." *Singer*, 297 S.E.2d at 476. Second, the evidence supports Defendants' contention that Plaintiff rejected the R.W. Griffin deal. As such, Defendant Booysen was free to pursue that

---

[4] There is no evidence indicating that Plaintiff even attempted to verify Defendant Booysen's distribution rights; therefore, it is difficult to conclude that Plaintiff reasonably believed that it obtained the indefinite right to distribute Albit.

deal without violating his fiduciary duties to B.S.T. *See Instrument Repair Serv., Inc. v. Gunby*, 518 S.E.2d 161, 164 (Ga. Ct. App. 1999) (finding that summary judgment was appropriate where the defendant-director presented an opportunity to his corporation and the corporation expressly declined to pursue it); *see also In re Pervis*, 512 B.R. 348, 369 (Bankr. N.D. Ga. 2014) (noting that officer does not breach its fiduciary duties "if the officer specifically informs the corporation of the new business opportunities and the corporation declines to take them"). Accordingly, Plaintiff has failed to demonstrate a likelihood of success on the merits regarding its claim that Defendants usurped a corporate opportunity.

As Plaintiff made clear during the hearing, Plaintiff takes no issue with the manufacturer's refusal to sell Plaintiff Albit. Rather, Plaintiff's complaint is with Defendant Booysen having any right to distribute Albit. In effect, Plaintiff is seeking an order enjoining Defendants from competing with B.S.T. Absent an enforceable non-compete agreement, however, the Court will not so enjoin Defendants.

      B.      <u>The Georgia Trade Secrets Act</u>

Plaintiff contends that it is entitled to a preliminary injunction to prevent Defendants from misappropriating its trade secrets. The Georgia Trade Secrets Act ("GTSA") provides a civil remedy for the misappropriation of trade secrets. O.C.G.A. § 10–1–760 *et seq.* Under the GTSA, "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." O.G.C.A. § 10-1-762.  To state such a claim, a plaintiff must allege that: (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret. *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290-91 (11th Cir. 2003). The GTSA defines a "trade secret" as follows:

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.G.C.A. § 10-1-761(4).

In its complaint, Plaintiff contends that Defendants misappropriated, among other things, "product composition and specifications, information regarding BST's finances and business plans, customer information, and BST's technical plans related to an effort to patent certain of its business inventions and processes." (Doc. 1-1 at ¶ 59.) At the hearing, however, the only evidence presented supporting Plaintiff's claim that Defendants misappropriated a trade secret was that Defendant Booysen had prepared a power point presentation regarding the potential sale of B.S.T. in May 2014. (*See* Pl. Ex. 25.)

First, nothing in the power point presentation qualifies as a trade secret as defined under the GTSA. Indeed, Plaintiff has failed to establish that the information contained therein is not generally known or readily ascertainable or that it has any economic value because others do not know or have access to it. Second, Plaintiff has failed to establish that Defendants misappropriated this information or are threatening to misappropriate it. Accordingly, Plaintiff has failed to meet its burden of establishing a likelihood of success on the merits of its misappropriation claim.

### C. The Uniform Deceptive Trade Practices Act

Pursuant to the Georgia Uniform Deceptive Trade Practices Act (the "GUDTPA"), "[a] person likely to be damaged by a deceptive trade practice may be granted an injunction." O.C.G.A. § 10–1–373. The GUDTPA provides, in relevant part, that:

> (a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he: (2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; (8) Disparages the goods, services, or business of another by false or misleading representation of fact; (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

O.C.G.A. § 10–1–372.

At the hearing, the only evidence Plaintiff introduced to support its claim for an injunction under the GUDTPA was Defendants' business card, which according to Plaintiff uses a logo that is materially the same as B.S.T.'s logo. (Pl. Ex. 29.) During the hearing,

9

Defendants agreed to stop using the business cards and other materials displaying the logo and Plaintiff agreed to abandon its motion for a preliminary injunction against further use of the logo. Accordingly, this issue is moot.

## II.   Immediate and Irreparable Injury

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Northeastern Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Sampson v. Murray,* 415 U.S. 61, 88 (1974)). "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176 (citation omitted). Plaintiff contends that it will suffer irreparable harm if Defendants are permitted to continue selling Albit. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Northeastern Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). "The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* (emphasis in original).

Plaintiff has failed to introduce any evidence that it will suffer irreparable harm in the absence of an injunction. Specifically, Plaintiff has failed to demonstrate that it will be unable to perform specific contracts or that Defendants are using any of its trade secrets. Rather, Plaintiff's claims of imminent harm are merely speculative. "As [the Eleventh Circuit] ha[s] emphasized on many occasions, [however,] the asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176 (citation and internal quotation marks omitted).  Therefore, even if Plaintiff could establish a likelihood of success on the merits of its claims, it would still not be entitled to a preliminary injunction as "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.* To the extent Plaintiff contends that Defendants usurped the R.W. Griffin deal, any such harm derived therefrom can be compensated through monetary relief; thus, Plaintiff will not suffer irreparable harm without an injunction.

### III. Balance of Harms

In balancing the harms for purposes of enjoining Defendants from continuing to sell Albit, the Court finds that Defendants would suffer extreme harm if further injunctive relief was entered in favor of Plaintiff. Defendant Booysen testified that his livelihood depended upon his ability to sell Albit and that he would be unable to survive financially if the Court prevented him from doing so. Plaintiff, on the other hand, would not be harmed as its has failed to demonstrate a likelihood of success on the merits and irreparable harm. Moreover, neither Shingler nor Thompson relies on B.S.T. or the sale of Albit as a source of income. For these reasons, the balance of harms tips in favor of denying injunctive relief with respect to Defendants' ability to distribute Albit.

### IV. Public Interest

An injunction prohibiting Defendants from distributing Albit would not serve the public interest as there is insufficient evidence to support a finding that Plaintiff acquired the exclusive right to distribute Albit and that Defendants are using Plaintiff's trade secrets.

### CONCLUSION

Based on the forgoing, Plaintiff's Motion for a Preliminary Injunction (Doc. 2) is **DENIED** as to Plaintiff's claims of usurpation of a corporate opportunity and misappropriation of trade secrets.  Accordingly, Plaintiff is permitted to continue selling and distributing Albit, unless otherwise ordered by the Court.

In light of the Parties' agreement and Plaintiff's abandonment of its Motion for a Preliminary Injunction with respect to its claim that Defendants' use of their business card and logo could lead to confusion in the market, Plaintiff's Motion is **DENIED** as moot. **SO ORDERED,** this 2nd day of July, 2015.

                                            /s/ Leslie J. Abrams
                                      **LESLIE J. ABRAMS, JUDGE**
                                      **UNITED STATES DISTRICT COURT**